UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

M.L.P. INVESTMENTS, L.L.C., )
et al., )
 )
            Plaintiffs, )
 )
        vs. )          Case No. 4:07CV1458-DJS
 )
QUANTA SPECIALTY LINES, )
INSURANCE COMPANY, et al., )
 )
            Defendants. )

## ORDER

On July 9, 2008, plaintiffs M.L.P. Investments, L.L.C.,
Precision Homes of Missouri, Inc., Pioneer Construction, Inc., and
M.L.P. Multi-Family Construction, L.L.C. filed an amended petition
with this Court against defendant Arch Specialty Lines Insurance
Company and defendant Quanta Specialty Lines Insurance Company.
Plaintiffs, companies engaged in residential construction, allege
that both Arch and Quanta issued commercial general liability
policies to plaintiffs.  Plaintiffs further allege that a lawsuit
was brought against plaintiffs by Centerpoint Energy-Mississippi
River Transmission Corporation, which sought damages pursuant to
plaintiffs' alleged encroachment onto a high pressure natural gas
pipeline easement owned by Centerpoint that occurred during the
policies' periods.  Plaintiffs tendered the Centerpoint claim to
both Arch and Quanta.  Both Arch and Quanta denied plaintiffs'
claims, and plaintiffs brought the instant action seeking
declaratory judgment and damages.

Now before the Court are plaintiffs' motion for summary judgment with regard to defendant Arch [Doc. #52], plaintiffs' motion for summary judgment with regard to defendant Quanta [Doc. #54], defendant Arch's motion for summary judgment [Doc. #42], and defendant Quanta's motion for summary judgment [Doc. #46]. These matters have been fully briefed and are ready for disposition.

## Standard of Review

In considering a motion for summary judgment, the Court must "view all of the evidence in the light most favorable to the nonmoving party and [will] give that party the benefit of all reasonable inferences to be drawn from the facts disclosed in the pleadings." Reich v. ConAgra, Inc., 987 F.2d 1357, 1359 (8th Cir. 1993). "Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Id. "Although the moving party has the burden of demonstrating the absence of genuine issues of material fact, the 'nonmoving party may not rest upon mere denials or allegations, but must instead set forth specific facts sufficient to raise a genuine issue for trial.'" Burchett v. Target Corp., 340 F.3d 510, 516 (8th Cir. 2003) (quoting Rose-Maston v. NME Hosps., Inc., 133 F.3d 1104, 1107 (8th Cir. 1998)).

In ruling on a motion for summary judgment, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world

- 2 -

apart from 'assuming' that general averments embrace the 'specific facts' needed to sustain the complaint." <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990). Consequently, in order to withstand a motion for summary judgment, evidence submitted by a non-movant must contain specific facts, and general statements will not be supplemented by a court's assumptions.

> It will not do to "presume" the missing facts because without them the affidavits would not establish the injury that they generally allege. That converts the operation of Rule 56 to a circular promenade: plaintiff's complaint makes general allegation of injury; defendant contests through Rule 56 existence of specific facts to support injury; plaintiff responds with affidavit containing general allegation of injury, which must be deemed to constitute averment of requisite specific facts since otherwise allegation of injury would be unsupported (which is precisely what defendant claims it is).

<u>Id. at 889</u>; <u>see also</u> <u>Stanback v. Best Diversified Prods., Inc.</u>, 180 F.3d 903, 909 (8th Cir. 1999) ("[G]eneral statements in affidavits and deposition testimony...are insufficient to withstand a properly-supported motion for summary judgment.") (citations omitted); <u>Allen v. Entergy Corp.</u>, 181 F.3d 902, 905 (8th Cir. 1999) ("[Plaintiff's] conclusory affidavit 'is devoid of any specific factual allegations'...and as such, it cannot withstand a properly supported summary judgment motion.") (quoting <u>Flannery v. Trans World Airlines, Inc.</u>, 160 F.3d 425, 428 (8th Cir. 1998)).

**Facts**

For purposes of these motions, the Court finds that the following facts are not in dispute, or have not been specifically controverted pursuant to E.D.Mo. L.R. 7-4.01(E).[1]

**Background**

Woodside Creek Townhomes, L.L.C. is a Missouri limited liability company. Woodside Creek Townhomes is a "single asset entity," in that its sole asset is a parcel of land situated in Jefferson County, Missouri, and the development thereon. This parcel is commonly known as the "Woodside Creek Development." Plaintiff Precision is a homebuilding company that builds single-family homes. Plaintiff Pioneer is the contractor of the Woodside Creek Development. Plaintiff M.L.P. Multi-Family Construction has no role in the Woodside Creek Development, but employs individuals who are involved with the development.

The Woodside Creek Development was originally purchased for development by M.L.P. Real Estate Acquisitions, L.L.C. The first site plan for the Woodside Creek Development was completed in approximately October or November of 2004. The second site plan for the Woodside Creek Development was completed in approximately February of 2005. M.L.P. Real Estate Acquisitions then sold the parcel to Precision on May 18, 2005. On October 25, 2005, title to the Woodside Creek Development was transferred to Woodside Creek Townhomes.

---

[1] "All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." E.D.Mo. L.R. 7-4.01(E).

Centerpoint is a corporation doing business in Missouri. Centerpoint owns, maintains, and services a network of natural gas pipelines that cross the State of Missouri. Centerpoint ownes, operates, and maintains a high pressure natural gas pipeline that crosses the Woodside Creek Development. The pipeline is an eight inch natural gas, high pressure transmission pipeline, which serves two thousand customers. Centerpoint also owns an easement for the pipeline. The terms of the easement grant Centerpoint a right of way to construct, operate, and maintain a gas pipeline without interference from construction or other activities within that right of way by third persons. Plaintiffs indicate they were first made aware of Centerpoint's pipeline in approximately November, 2004.

The Woodside Creek Development is comprised of fifty-two lots, each of which contain residential duplexes. Woodside Creek Townhomes is responsible for developing houses on the lots. The drawings for the project revealed that approximately 400 to 500 feet of a planned road, Woodside Creek Drive, was to be placed over Centerpoint's pipeline easement.

On or about January 13, 2005, Rick Hardester, an employee of Centerpoint, directed email correspondence to David Todd, an employee of Pioneer at the time, enclosing Centerpoint's encroachment specifications. These pipeline encroachment specifications indicated in part that the anticipated permanent roadways may require that the existing pipe be cut and replaced with pipe of appropriate design and that all drawings needed

approval by Centerpoint prior to construction. On April 27, 2005, Hardester reviewed the drawings for the Woodside Creek Development. In reviewing the drawings, he discovered that an anticipated roadway of the Woodside Creek Development ran parallel to and over the Centerpoint pipeline. Hardester then met with and told Todd that Centerpoint rejected the plans and would not allow for a pipeline to run parallel underneath the roadway, and asked Todd to make adjustments. Nevertheless, plaintiffs continued with the building of the road, grading the area in late April or early May, 2005, and starting construction on or about June 4, 2005.

On June 15, 2005, Lee Terrell, an employee of Centerpoint, directed correspondence to John Jenkins of M.L.P. Investments, informing Jenkins that the plans for the Woodside Creek Development showed that the roadway would encroach upon Centerpoint's pipeline easement and that Centerpoint did not approve the plans. Terrell requested that any ongoing construction cease and stated that an agreement with Centerpoint needed to be in place before any further construction. On June 23, 2005, William Carter, legal counsel for Centerpoint, directed correspondence to Jenkins, stating that "continuing the development in violation of the terms of the right of way and/or safety regulations could result in an extremely dangerous situation with serious consequences and will leave [Centerpoint] no alternative than to seek appropriate legal measures to prevent said development."

Plaintiffs state that they believed Centerpoint's claims lacked merit, and that Centerpoint's claims and efforts to stop

plaintiffs' work were made as a bargaining chip and to gain an advantage. Specifically, Jenkins testified in his deposition that "we had come to an understanding that outside of all of this that they had a requirement internally that their pipe needed to be upgraded to a different thickness or something like that and so that what they were trying to do was find a way to get us to pay for an upgrade that they had to do anyways."

On August 1, 2005, Centerpoint filed suit against plaintiffs seeking a temporary restraining order to restrain plaintiffs from encroaching on Centerpoint's easement. A temporary restraining order hearing was set on August 25, 2005. On August 17, 2005, Jenkins sent an email to Michael Mannion, legal counsel for M.L.P. Multi-Family Construction, stating that "we need to get the road in prior to Thursday in order for us to be in the best position possible if the judge decides to rule against us." Further, Kevin Miller, an individual retained by plaintiffs to perform soil stabilization of the subgrade as well as paving the roadway for the Woodside Creek Development, was asked to work overtime to get the job finished as soon as possible because, in part, the pending temporary restraining order hearing date was approaching.[2]

---

[2]On or about August 11, 2005, a subcontractor for Pioneer damaged Centerpoint's pipeline. The cost to repair the damaged pipeline was approximately $44,000.00. This claim was eventually paid by another source, and therefore is not a claim for which indemnity is currently sought. However, plaintiffs state that they were sued for such damages and should have been tendered a defense until such claims against plaintiffs were removed.

Centerpoint then filed a petition, alleging that plaintiffs had encroached or were going to encroach on Centerpoint's easement, that plaintiffs had damaged the pipeline, and that Centerpoint's easement had been knowingly and intentionally obstructed and interfered with by plaintiffs. Plaintiffs thereafter entered into a settlement with Centerpoint for $300,000.00. Plaintiffs paid $150,000.00 of the $300,000.00, and Woodside Townhomes paid the remaining $150,000.00.

**Defendants' Insurance Policies**[3]

**Arch Policy**

Arch issued a renewal commercial general liability policy to plaintiffs, for the policy period July 1, 2004, to July 31, 2005, and renewed the policy again for the policy period July 31, 2005, to July 1, 2006. Coverage A of the Arch policy states:

> 1. Insuring Agreement
>
> a. We will pay those sums in excess of the "Self-Insured Retention" that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION V – SUPPLEMENTARY PAYMENTS. This insurance applies only to "bodily injury" and "property damage" which occurs during the policy period. The "bodily injury" and "property damage" must be caused by an "occurrence." The "occurrence must take place in the "coverage territory." The amount we will pay for damages is limited as described in SECTION IV – LIMITS OF INSURANCE.

_____

[3]The Court has reproduced here only those portions of the policies at issue that are relevant to the discussion below. However, the Court has reviewed and considered the policies in their entirety.

b. Rights and duties relating to the defense, settlement, and investigation of claims or "suits" to which this policy may apply are set forth in SECTION II – DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS AND "SUITS."

The Arch policy defines property damage as:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use will be deemed to occur at the time of physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use will be deemed to occur at the time of the "occurrence" that caused it.

The Arch policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Coverage B of the Arch policy states:

1. Insuring Agreement

a. We will pay those sums in excess of the "Self-Insured Retention" that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for in SECTION V – SUPPLEMENTARY PAYMENTS. The amount we will pay for damages is limited as described in SECTION IV – LIMITS OF INSURANCE.

b. Rights and duties relating to the defense, settlement, and investigation of claims or "suits" to which this policy may apply are set forth in SECTION II – DEFENSE, SETTLEMENT AND INVESTIGATION OF CLAIMS OR "SUITS".

c. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was

committed in the "coverage territory" during the policy period.

The Arch policy contains several exclusions to coverage A, including,

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

Additionally, the Arch policy contains several exclusions to coverage B, including,

(a) "Personal and advertising injury:"

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal advertising injury."

For purposes of this motion, there is no dispute that the Arch policy was in effect at all times relevant to Centerpoint's lawsuit.

**Quanta Policy**

Quanta issued a commercial general liability policy to plaintiffs for the policy period March 31, 2005, through March 31, 2006. Coverage A, subsection b of the Quanta Policy states:

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply...

...

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period...

The Quanta Policy defines property damage as:

(a) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it....

The Quanta Policy defines an occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Finally, the Quanta policy contains several exclusions, including an exclusion for expected or intended injury, which excludes,

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

On April 29, 2005, notice of cancellation of insurance was sent to Precision Homes of MO, Inc. (the first named insured on the policy), at 607 S. Lindbergh, St. Louis, MO 63131 (the correct address for Precision Homes). See Doc. #73-3. This notice states that the policy is being cancelled, that insurance will cease on May 10, 2005, and that the reason for cancellation is non-payment

of premium.  Plaintiffs state that they never received the notice of cancellation.

**Instant Action**

As a result of Centerpoint's lawsuit, plaintiffs filed claims with both Arch and Quanta on January 17, 2006.  Both Arch and Quanta have denied plaintiffs a defense to and indemnification for the claims asserted by Centerpoint.  Plaintiffs thereafter filed suit in Missouri state court, and the action was removed to this Court.  In their petition, plaintiffs seek a declaration that plaintiffs are entitled to coverage under the two commercial general liability insurance policies, the Arch policy and the Quanta policy, as well as damages arising from Centerpoint's second amended complaint against plaintiffs.

## Discussion

The current action was removed to this Court pursuant to this Court's diversity jurisdiction.  "State law controls the construction of insurance policies when a federal court has jurisdiction based on diversity of citizenship." J.E. Jones Const. Co. v. Chubb & Sons, Inc., 486 F.3d 337, 341 (8th Cir. 2007) (citing Langley v. Allstate Ins. Co., 995 F.2d 841, 844 (8th Cir. 1993)).  The parties do not dispute that Missouri law applies to this case.  Under Missouri law, insurance policies are contracts to which the rules of contract construction apply.  See Peters v. Employers Mut. Cas. Co., 853 S.W.2d 300, 301-02 (Mo. 1993) (en banc) ("This Court has long held that the general rules for interpretation of other contracts apply to insurance contracts as

well.") (citations omitted). If an insurance policy is unambiguous, it "will be enforced as written absent a statute or public policy requiring coverage." Id. at 302 (citations omitted). However, if the language is ambiguous, it will be construed against the insurer. Id. "An ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the words used in the contract." Id. (citation omitted).

Under Missouri law, the determination of an insurance company's duty to defend against a claim differs from the determination of that insurance company's duty to indemnify for a claim. While the duty to indemnify "turns on whether the claim is actually covered by the [p]olicy," the duty to defend is broader and "turns on whether the claim is potentially covered by the [p]olicy." Am. Economy Ins. Co. v. Jackson, 476 F.3d 620, 624 (8th Cir. 2007) (emphasis in original) (citations omitted). "The insurer's duty to defend arises whenever there is a potential or possible liability to pay based on the facts at the outset of the case and is not dependent on the probable liability to pay based on the facts ascertained through trial. The insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations in the complaint." Lampert v. State Farm Fire & Cas. Co., 85 S.W.3d 90, 93 (Mo. App. 2002) (citation omitted).

**Defendant Arch**

Defendant Arch states that its policy covered only "occurrences," and that term is defined by the policy as an

"accident."[4] Defendant Arch argues that, because plaintiffs knew their actions would encroach on Centerpoint's easement, the resulting damage was not by accident, and therefore not an occurrence covered by the policy. Accordingly, defendant Arch argues that it owed no duty to plaintiffs, and that summary judgment should be granted in its favor.

Plaintiffs, on the other hand, state that while they performed work on the road over Centerpoint's pipeline and easement after Centerpoint objected, plaintiffs believed that Centerpoint's objections were meritless and that no damage would come to pass. In effect, plaintiffs argue that, although plaintiffs intentionally built the road over Centerpoint's pipeline, there is no evidence that plaintiffs intended or knew that such conduct would cause the loss of use of the pipeline.

As a preliminary matter, the Court finds that, giving the relevant terms used in the policy their plain and ordinary meaning, the Arch policy is not ambiguous. Am. Economy, 476 F.3d at 624 ("A court should not search for an ambiguity where there is none."). Accordingly, judicial construction is not necessary.

As stated above, Arch's duty to indemnify turns on whether the Arch policy actually afforded coverage for plaintiffs' loss. In this case, that determination turns on whether the damage plaintiffs caused to Centerpoint occurred accidentally or intentionally. "[T]he term 'caused by accident,' as used in

---

[4]The Court notes that coverage A and coverage B contain similar such exclusions.

- 14 -

policies of liability insurance, is satisfied where the insured did not intend that damage result from his act although the act itself was intentional and did so result." <u>Fidelity and Cas. Co. of N.Y. v. Wrather</u>, 652 S.W.2d 245, 249 (Mo. App. 1983). However, "as a matter of public policy, a liability insurance policy does not afford coverage for damage intentionally inflicted by the insured...." <u>Id.</u>

In <u>Fidelity</u>, a tractor-trailer unit sustained damage in a series of collisions which occurred because a farmer set fire to his field, which caused black smoke to obstruct motorists' views on a nearby highway. The tractor-trailer's owner filed suit against the farmer, and the farmer's insurance company, claiming that the farmer intentionally set fire to the field, refused to defend or indemnify the farmer pursuant to the policy's exclusion of intentional acts. Despite finding that the farmer intentionally set fire to the field, the Missouri Court of Appeals found that there was nothing in the record to show that the farmer, by his conduct in lighting the fire, intended to cause damage to the plaintiff's tractor-trailer unit. Accordingly, the Missouri court found that the policy's exclusion did not apply.

The Court finds that the instant action is distinguishable from <u>Fidelity</u>. While in <u>Fidelity</u> the insured had no expectation of the tractor-trailer owner's resulting damage, plaintiffs in this case were repeatedly made aware of the existence of Centerpoint's pipeline and easement. Although plaintiffs' goal was to complete the road, they possessed an expectation that doing

so would damage Centerpoint.  In this case, there is no genuine issue of material fact with regard to plaintiffs' knowledge of the pipeline, Centerpoint's continued objection to plaintiffs' activities, and plaintiffs' persistence in continuing construction of the road despite the encroachment that it would cause.  The damage sustained by Centerpoint is exactly the type foreseeable from such an encroachment.  The Court agrees with defendant Arch that plaintiffs' actions in continuing to build the road after Centerpoint's objection, and, indeed, rushing construction to finish before the temporary restraining order hearing, were not accidental but stemmed from a deliberate business decision to go forward in spite of the expected damage that would occur.  Such damages are specifically excluded from the Arch policy. Accordingly, since the damages for which plaintiffs now seek coverage were excluded, the Court finds that defendant Arch had no duty to indemnify plaintiffs.

With regard to defendant Arch's duty to defend, the Court has reviewed Centerpoint's petition as well as plaintiffs' petition.  Of note, Centerpoint's petition alleges that after Centerpoint became aware of plaintiffs' development plans, it advised that intended construction ran over Centerpoint's pipline in a manner that violated Centerpoint's rights, but that plaintiffs built the road anyway.  Further, Centerpoint alleges that plaintiffs "continued to construct the roadway and infrastructure in question and have given every indication they intend to continue to do so despite [Centerpoint's] warnings and protests...."

Finally, Centerpoint alleges that its right of way "has been <u>knowingly and intentionally</u> obstructed and interfered with...." Given Centerpoint's allegations that plaintiffs' actions were <u>with knowledge</u> and <u>intentional</u>, and because of the Arch policy's exclusion of such actions, Centerpoint's claim for damages against plaintiffs was not within, nor potentially within, the Arch policy's coverage. Accordingly, the Court finds that Arch had no duty to defend plaintiffs.

Finding that defendant Arch had no duty to defend or indemnify plaintiffs, the Court will grant defendant Arch's motion for summary judgment, and will deny plaintiffs' motion for summary judgment.

**Defendant Quanta**

Defendant Quanta states that it sent plaintiffs a notice of cancellation for non-payment on April 29, 2005, and that Centerpoint's claim against plaintiffs did not accrue until after June, 2005. Accordingly, defendant Quanta argues that it has no duty to defend or indemnify plaintiffs, because no valid policy was in existence at the time of Centerpoint's claim, and that summary judgment should be granted in its favor.

Plaintiffs, on the other hand, state that it never received a cancellation notice, and therefore a valid policy existed at the time of Centerpoint's claim. Further, plaintiff's argue that even if Quanta had cancelled its policy with the April 29, 2005, notice, Centerpoint's claim accrued in late April, before the notice was mailed. Consequently, plaintiffs argue that a valid

policy existed at the time of Centerpoint's claim, and that summary judgment should be granted in plaintiffs' favor.

Under Missouri law, an insurer may cancel an insurance policy for non-payment of the premium. However, that insurer is required to give at least ten-days notice, and must mail such notice to the named insured at the address shown in the policy. See Mo. Rev. Stat. § 375.005 ("Proof of mailing notice of cancellation...to the named insured at the address shown in the policy, shall be sufficient proof of notice."). The relevant inquiry is not whether the insured received the notice, but whether the insurer mailed the notice. See Gambill v. Cedar Fork Mut. Aid Soc., 967 S.W.2d 310, 312 (Mo. App. 1998) ("Plaintiff correctly insists that Defendant is required to prove it mailed a notice of cancellation to him at the address shown on Defendant's records."). If there is sufficient proof of mailing of a cancellation notice, "there is no genuine issue of material fact concerning notice." Blair ex rel. Snider v. Perry County Mut. Ins. Co., 2003 WL 432224, at *4 (Mo. App. 2003), rev'd on other grounds, 118 S.W.3d 605 (Mo. 2003) (en banc).

Pursuant to the parties' policy agreement in this case, the insurer could cancel the policy "by mailing or delivering to the first Named Insured written notice of cancellation at least: (a) 10 days before the effective date of cancellation if [insurer] cancel[s] for nonpayment of premium." Further, pursuant to the parties' agreement, the insurer was to mail "notice to the first Named Insured's last mailing address known to [the insurer]," and

"proof of mailing will be sufficient proof of notice."  Doc. #73-2, p. 12.

In this case, Quanta has submitted a document demonstrating that, on April 29, 2005, notice of cancellation of insurance was sent to Precision Homes of MO, Inc., at 607 S. Lindbergh, St. Louis, MO 63131.  See Doc. #73-3.  This notice states that the policy is being cancelled, that insurance will cease on May 10, 2005, and that the reason for cancellation is non-payment of premium.  Although plaintiffs assert they never received such a notice,[5] the relevant inquiry focuses on the mailing, not

---

[5]The Court further notes that the evidence submitted by plaintiffs on the issue of non-receipt of the cancellation notice consists of the following deposition testimony of James E. Brueggeman:

> A. And during beginning stages of the dispute with CenterPoint I had very little exposure to the insurance part of the business, so I was really just trying to get some background from Mr. [Jeffery] Mentel.

> Q. And what did he tell you?

> A. Mr. Mentel told me that in March of 2005 an insurance policy was taken with Quanta regarding the work to be performed at Woodside Creek Townhomes, L.L.C. and that the initial premium billing for that policy was based on assumptions that were incorrect which caused the billing to be inflated.

> Q. Did he say anything else?

> A. He then told me that he was in the process of negotiating a premium that was based on more accurate information and that a premium amount had been agreed upon by Quanta and that Woodside Creek Townhomes, L.L.C. had paid an amount to Quanta, I believe in late June or early July 2005, as an initial payment on that premium.

> Q. Did he say anything else?

> A. He said that he had not received a cancellation notice on the Quanta policy, nor did he understand

the receipt, of the notice. Because Quanta has submitted sufficient evidence of the April 29, 2005, mailing, there is no genuine issue of material fact concerning the May 10, 2005, cancellation date.

Plaintiffs assert that if the policy was cancelled on May 10, 2005, Quanta is still liable because some of Centerpoint's damages accrued between March 31, 2005, and April 29, 2005. To wit, plaintiffs cite <u>Scottsdale Ins. Co. v. Ratliff</u>, 927 S.W.2d 531 (Mo. App. 1996), and <u>Stark Liquidation Co. v. Florists' Mut. Ins. Co.</u>, 243 S.W.3d 385 (Mo. App. 2007), for the proposition that if some of the damage allegedly occurred while the policy was in force, that is sufficient to require a defense. In <u>Scottsdale</u>, an insurer sought declaratory judgment that it had no duty to defend the insured insect-extermination company after a homeowner filed suit against the insured extermination company alleging that the insured extermination company negligently failed to detect a termite infestation. While the insured extermination company had insurance at the time of the allegedly negligent inspection, the insurer argued that the homeowner's damage occurred after the

---

that any representative of Precision Homes or Woodside Creek Townhomes, L.L.C. had received a cancellation notice from Quanta.

Doc. #70-2, p. 2. Mentel, the source of the statement that no cancellation notice was received by Precision Homes, was plaintiffs' insurance broker and an employee of The Daniel and Henry Company, not plaintiffs' employee. The record is unclear as to why Mentel would be the individual with knowledge of plaintiffs' non-receipt of the cancellation notice, and the Court is not convinced that plaintiffs have offered sufficient evidence placing in dispute their non-receipt of the cancellation notice. Regardless, as noted above, the relevant inquiry is not whether plaintiffs actually received the notice, but whether Quanta mailed the notice.

policy ended, and that there was no duty to defend the insured. The court disagreed, and stated that, since the homeowner's petition alleged that some damage (or, at least, some infestation) occurred during the policy period, "[s]ome of this damage necessarily occurred while the policy was in force, and this is sufficient to require a defense." Scottsdale, 927 S.W.2d at 534.

Plaintiffs also cite Stark to support their position that Quanta is liable under the parties' insurance contract. In Stark, an orchard owner, and a seller of apricot trees, sought a declaratory judgment against the seller's insurer after the trees the owner bought from seller (which were infected with canker) failed to produce fruit. In that case, the insured's policy ran from June 1, 1993, to November 15, 2004, the owner bought seller's trees in March of 1994, and seller stated that these trees did not produce marketable fruit in 1995 and 1996. The insurer argued that the seller's damages were outside the policy period, and therefore was not liable under the insurance contract. The court disagreed, and stated that,

> As the record reflects, [owner] alleged continuing damage to his orchard caused by the apricot trees, in that the trees were negligently infected with canker in the Spring of 1994, the time of delivery....[Owner's] loss began during the policies' periods and continued until [owner] discovered that the trees were unable to produce fruit as a result of [seller's] negligence. Accordingly, [insurer] had a duty to defend [seller] against [owner's] lawsuit.

Stark, 243 S.W.3d at 394.

In the petition brought by Centerpoint against plaintiffs, Centerpoint alleged that plaintiffs' "construction activities on the parcel in question threaten to and/or have already encroached upon and blocked access to [Centerpoint's] right of way," and that plaintiffs' "encroachment is imminent and/or has already taken place." Further, Centerpoint alleged that plaintiffs breached their duty of due care and damaged Centerpoint's pipeline on August 11, 2005. Doc. #73-4, pp. 4-8. Although Centerpoint's complaint is not specific as to when the blocked access occurred (or even if blocked access had yet occurred), it is clear that Centerpoint seeks to remedy or prevent two wrongs: (1) blocked access to its pipeline; and (2) damage to the pipeline. Even if plaintiffs had started preparing the area by grading it while the policy was in effect, such activity did not block or damage Centerpoint's pipeline. That is, simply preparing an area in a manner that is consistent with some future harm is not the same as causing that harm. Accordingly, this case differs from <u>Scottsdale</u> and <u>Stark</u>, in that the damage in this case did not accrue during the policy period.[6]

Since there is no genuine issue of material fact with regard to the cancellation of the Quanta policy, and since no claim accrued during the short pendency of the Quanta policy, the Court will deny plaintiffs' motion for summary judgment, and will grant Quanta's motion for summary judgment.

---

[6]For example, in <u>Stark</u>, it would not be the digging of holes to plant the apricot trees that damaged the owner, but rather the <u>delivery</u> of infected trees.

For the above stated reasons,

**IT IS HEREBY ORDERED** that plaintiffs M.L.P. Investments, L.L.C., Precision Homes of Missouri, Inc., Pioneer Construction, Inc., and M.L.P. Multi-Family Construction, L.L.C.'s motion for summary judgment with regard to defendant Arch Specialty Lines Insurance Company [Doc. #52] is denied.

**IT IS FURTHER ORDERED** that plaintiffs M.L.P. Investments, L.L.C., Precision Homes of Missouri, Inc., Pioneer Construction, Inc., and M.L.P. Multi-Family Construction, L.L.C.'s motion for summary judgment with regard to defendant Quanta Specialty Lines Insurance Company [Doc. #54] is denied.

**IT IS FURTHER ORDERED** that defendant Arch Specialty Lines Insurance Company's motion for summary judgment [Doc. #42] is granted.

**IT IS FURTHER ORDERED** that defendant Quanta Specialty Lines Insurance Company's motion for summary judgment [Doc. #46] is granted.

Dated this __17th__ day of November, 2008.

/s/Donald J. Stohr
UNITED STATES DISTRICT JUDGE